**Sherry Lea RUSH, Appellant,**

v.

**Tasha Lee JOSTOCK, et al., Respondents.**

**No. A05–714.**

Court of Appeals of Minnesota.

March 7, 2006.

Charles J. Suk, Beth K. Bussian, Suk Law Firm, Ltd., Rochester, MN, for appellant.

Lee L. LaBore, LaBore, Giuliani, Cosgriff, & Viltoft, Ltd., Hopkins, MN, for respondents.

Considered and decided by PETERSON, Presiding Judge, HALBROOKS, Judge, and HUSPENI, Judge.

## OPINION

HUSPENI, Judge.*

Appellant challenges (1) the damage award of the jury and (2) the trial court's denial of a motion for new trial or conditional additur, and argues that the trial court erred in (a) admitting testimony that appellant was malingering, (b) failing to submit to the jury appellant's proposed instruction regarding payment of medical bills, (c) accepting the jury verdict in which there was no award for past or future pain and suffering, (d) failing to award a collateral source offset in the amount of total automobile insurance premiums, and (e) concluding that respondents were the prevailing party and awarding costs and disbursements to them. We affirm in part, reverse in part, and remand.

## FACTS

A vehicle driven by respondent Tasha Jostock rear-ended one driven by appellant Sherry Rush. Appellant sued Jostock and the owner of the vehicle, Jostock's mother, respondent Cindy Jostock, claiming that she suffered cervical spinal injuries. Respondents' offer of judgment pursuant to Minn. R. Civ. P. 68 in the amount of $35,000 was rejected by appellant, and a jury trial followed. Prior to trial, respondents admitted liability; the sole issue before the jury was damages.

In answer to appellant's initial interrogatories concerning expert witnesses and expected defenses, respondents stated that experts had yet to be identified, that discovery was continuing, and that defenses were as yet unknown. Subsequently, appellant was examined by respondents' expert, Dr. Stephen Kazi, on two occasions. After the first examination, Dr. Kazi noted that appellant displayed two of five Waddell's signs,[1] which indicated "probable presence of symptom magnification and functional overlay." Over objection by appellant, Dr. Kazi conducted a second exam-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. Waddell's signs are five in number and are considered signifiers of non-organic source of low back pain when three or more of the signs are present.

ination, after which he concluded that appellant displayed one of five Waddell's signs.

In a deposition conducted by appellant, at which Dr. Kazi was questioned about his findings, respondents produced a copy of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition (DSM–IV). Dr. Kazi recognized the DSM–IV as a learned treatise, whereupon respondents' counsel read specific sections relating to malingering. When asked, Dr. Kazi opined that appellant was malingering or exaggerating her symptoms of pain.

When appellant subsequently sought supplementation of discovery, respondents answered that all information they intended to rely on had been provided to appellant. Regarding possible impeachment evidence, respondents indicated they could make that determination only when the testimony of appellant or other witnesses had been presented.

Appellant, through a motion in limine prior to trial, sought to exclude testimony of Dr. Kazi regarding Waddell's signs and the DSM–IV interpretation of those signs. Appellant argued that Waddell's signs were clinically insignificant in cases involving cervical pain; that in order for Waddell's signs to be of significance, three of five must be present, which was not the case here; that respondents had never identified the DSM–IV as a treatise which was to be used in the proceeding; and that respondents had failed to qualify Dr. Kazi, an orthopedist, as qualified to testify about the contents of the DSM–IV. The trial court, in denying appellant's motion in limine, declared that the issue was not one of admissibility but one of the weight to be given by the jury to Dr. Kazi's opinions.

In a posttrial motion for new trial or conditional additur and amended findings of fact and conclusions of law, appellant claimed that respondents' counsel made improper and unsolicited comments during voir dire, that there was passion or prejudice demonstrated in the jury verdict, that the verdict was unsupported by evidence, that Dr. Kazi should not have been allowed to testify about the DSM–IV, that appellant's proposed jury instruction regarding payment of medical bills should have been given, that the court's collateral source offset decision was erroneous, that the court erred in awarding respondents costs and disbursements, and that the court erred in refusing to allow appellant to tax her costs and disbursements. Appellant's motion was denied in its entirety, and this appeal followed.

## ISSUES

I. Did the trial court commit prejudicial error when it allowed the admission of Dr. Kazi's testimony concerning his medical findings?

II. Did the trial court abuse its discretion by not giving appellant's proposed jury instruction with regard to payment of medical bills?

III. Did the trial court abuse its discretion when it denied appellant's motion for a new trial or conditional additur?

IV. Did the trial court err in determining that appellant was not entitled to recover her total premiums for automobile insurance for the two-year period immediately preceding the accident?

V. Did the trial court err when it awarded costs and disbursements to respondents and denied appellant costs and disbursements?

## ANALYSIS

### I.

■ Absent an erroneous interpretation of the law, the question of whether to

admit evidence is within the district court's discretion. *Kroning v. State Farm Auto. Ins. Co.,* 567 N.W.2d 42, 45-46 (Minn. 1997). "Entitlement to a new trial on the grounds of improper evidentiary rulings rests upon the complaining party's ability to demonstrate prejudicial error." *Id.* at 46 (quotation omitted). The standard of review of the admissibility of expert testimony is determined under a two-pronged analysis. *Goeb v. Tharaldson,* 615 N.W.2d 800, 815 (Minn.2000).

> Whether a particular principle or technique satisfies the first prong, general acceptance in the relevant scientific field, is a question of law that [appellate courts] review de novo. District court determinations under the second prong, foundational reliability, are reviewed under an abuse of discretion standard, as are determinations of expert witness qualifications and helpfulness.

*Id.* (citation omitted).

■ Appellant argues that the testimony of Dr. Kazi concerning Waddell's signs and the DSM-IV was misleading and highly prejudicial; that the Waddell's signs are clinically insignificant because they are used to detect non-organic physical signs of low back pain not cervical spine pain; that the DSM-IV is used to diagnose psychiatric issues and Dr. Kazi is not a psychiatrist; and that in order for the Waddell's test to be significant, a patient must show a minimum of three positive Waddell's signs, and she displayed only one or two.

■ "The competency of a witness to provide expert medical testimony depends upon both the degree of the witness' scientific knowledge and the extent of the wit-

ness' practical experience with the matter which is the subject of the offered testimony." *Reinhardt v. Colton,* 337 N.W.2d 88, 93 (Minn.1983). After a thorough review of the evidence, we conclude that the trial court did not abuse its discretion by permitting Dr. Kazi to testify regarding Waddell's signs.[2] In resolving this issue as one of weight, not admissibility, the trial court noted the ability of appellant to cross-examine Dr. Kazi in order to diminish his credibility. That opportunity was exercised.

■ Appellant also argues that the trial court erred in admitting Dr. Kazi's testimony with reference to the DSM-IV because respondents failed to disclose their intent to use the DSM-IV and because Dr. Kazi is not qualified to render a psychiatric diagnoses based on that publication. We agree with the conclusion of the trial court that it should have come as no surprise to appellant that respondents would present evidence on malingering, including reference to the DSM-IV. Dr. Kazi's independent medical examination report referred to the defense of malingering; during his deposition, he recognized the DSM-IV as a learned treatise. When asked, he indicated agreement with the signs for malingering identified in that treatise. There is nothing in the record, however, to indicate that Dr. Kazi relied on the DSM-IV in reaching his conclusion that appellant had not sustained any permanent injury. To the contrary, the record supports a determination that his conclusion was based on physical examinations of appellant, x-rays and MRIs of appellant, medical records, and the medical expertise

---

**2.** Further support for the trial court's decision regarding admission of the testimony of Dr. Kazi is reflected in the record. Dr. Kazi has 36 years' experience in the practice of medicine, is board certified by the American Board of Orthopedic Surgery and the American Board of Neurological and Orthopedic Surgery with emphasis on the spine, and is licensed to practice medicine in 11 states. Further, appellant's own physician administered Waddell's test, although no positive signs of malingering were found.

and experience of Dr. Kazi. We see no error in the trial court's decisions regarding the admissibility and scope of the testimony of Dr. Kazi.

## II.

■■■■ Appellate courts will not reverse a trial court's decision regarding jury instructions unless the instructions constituted an abuse of discretion. *Alholm v. Wilt,* 394 N.W.2d 488, 490 (Minn. 1986). Trial courts are allowed considerable latitude in selecting the language in jury instructions. *Id.* Where instructions fairly and correctly state the applicable law, an appellate court will not grant a new trial. *Alevizos v. Metro. Airports Comm'n,* 452 N.W.2d 492, 501 (Minn.App. 1990), *review denied* (Minn. May 11, 1990).

■■■■ Appellant requested that the following instruction be given to the jury: "Regarding the subject of medical bills, you need not worry about whether some of the medical bills were paid by other sources. As the judge, I will see to it that no one is paid twice for the same thing." The trial court denied appellant's request, and instead instructed the jury that past damages for health care could be awarded "up to the time of your verdict," that damages for loss of earnings could be awarded "from the time of injury to date," and cautioned the jury to "not consider the fact that [appellant] actually received her salary for all or part of the time in deciding lost value of [her] working time." On appeal, appellant argues that the jury was confused about its role in determining a reasonable value for her damages and was tainted by testimony elicited by respondents regarding prior compensation given to her by third parties. It is her contention that her proposed instruction would have clarified any confusion.[3]

During deliberations, the jury posed a question to the court asking whether any insurance company had paid appellant's health care and diagnostic expenses. The court responded that the jury was to decide what health care and diagnostic expenses were directly related to the accident and that the court would handle all other concerns. Appellant argues that the jury's question demonstrates misunderstanding; that the jury was attempting to determine the amount of money to be awarded, not the value of appellant's damages; and that the failure of the jury to award damages for past and future pain and suffering cannot be reconciled with its awards for past medical expenses and wage losses.

We conclude that appellant's argument regarding jury instructions lacks merit and that the instructions given were sufficient. Any possible confusion was clarified by the court's answer to the jury's question. Additionally, during closing arguments, appellant's counsel, without objection from respondents, informed the jury

> that the judge is going to ensure that there are no double payments. . . . The judge is going to deduct anything that has already been paid . . . don't consider whether [appellant was] paid or not. . . . Don't worry, because the judge is going to make sure that there aren't any improper payments and so forth. She's going to deduct anything that has been paid, so that's not going to be an issue.

There was no prejudice to appellant when the court denied her proposed jury instruction. The intent of the proposed

---

3. During cross-examination, without objection, appellant was questioned about wage loss. On redirect, questions by appellant's own counsel regarding wage loss were objected to by respondents. The trial court sustained those objections and cautioned appellant's counsel that he was approaching inquiry about benefits other than wage loss.

instruction was relayed to the jury through instructions given by the court and during closing arguments of counsel. The trial court's decision as to the jury instructions was not an abuse of discretion.

Finally, appellant urges that the jury award of zero damages for past and future pain and suffering could only have been the result of passion and prejudice. Again, we disagree. Evidence at trial and arguments of counsel[4] demonstrate that such award was within the province of the jury.

## III.

■ Appellant next argues she is entitled to a new trial or conditional additur because the verdict of the jury was perverse, inadequate, not supported by the evidence, and therefore must have been motivated by mistake, passion, and/or prejudice.

■ An appellate court "will not set aside a jury verdict on an appeal from a district court's denial of a motion for a new trial 'unless it is manifestly and palpably contrary to the evidence viewed as a whole and in the light most favorable to the verdict.'" *Navarre v. S. Washington County Schools*, 652 N.W.2d 9, 21 (Minn. 2002) (quotation omitted). Generally, a new trial on damages will be granted only where the verdict is so inadequate or excessive that it "could only have been rendered on account of passion or prejudice." *Flanagan v. Lindberg*, 404 N.W.2d 799, 800 (Minn.1987) (quotation omitted); *see also* Minn. R. Civ. P. 59.01(e). A trial court has the broadest possible discretion

to determine whether a new trial should be granted based on an inadequate award of damages. Its decision will not be reversed "absent a clear abuse of that discretion and the existence of the most unusual circumstances." *Pulkrabek v. Johnson*, 418 N.W.2d 514, 516 (Minn.App.1988) (quotation omitted), *review denied* (Minn. May 4, 1988). Similarly, whether to grant additur rests almost wholly within the trial court's discretion. *Krueger v. Knutson*, 261 Minn. 144, 158, 111 N.W.2d 526, 535 (1961).

Appellant relies on *Walser v. Vinge*, 275 Minn. 230, 146 N.W.2d 537 (1966), to support her argument. In *Walser*, no award was made for pain or suffering or for wage loss, despite testimony regarding plaintiff's two surgeries and inability to work as efficiently as before the accident. 275 Minn. at 231, 146 N.W.2d at 538. Medical experts testified that the plaintiff sustained a permanent disability to his back resulting in 20% loss of function. *Id.* at 233, 146 N.W.2d at 539. The district court denied plaintiff's request for a new trial, and the supreme court reversed, stating that a jury, where it awarded pecuniary damages and liability is established, is "bound to take into consideration all of the elements of damage which are proved." *Id.* at 235, 146 N.W.2d at 540. A jury should "take into consideration proven damages resulting from pain and suffering, loss of wages, and impairment of earning capacity." *Id.*

Appellant's reliance on *Walser* is misplaced. Unlike that case, where there was no award for wage loss and where there was compelling testimony of permanent injury, appellant here was awarded wage

---

4. The zero damage award for pain and suffering is supported, at least in part, by the closing argument of appellant's own counsel, who stated:

> If you [believe] [Dr.] Kazi, if that's the way you look at things, then ... it's a zero for future pain, suffering, [and] disability. In

other words, you don't believe anything [appellant] has told you and you don't believe anything that [appellant's] doctors told her and told you and you don't believe what's in the Mayo Clinic medical record. And if that's the case, you will put zero.

loss damages, and objective evidence of permanent injury, similar to that in *Walser*, was absent. Physical examinations of appellant showed normal muscle reflexes, extension, and rotation. All CT scans, MRIs, EMGs, and x-rays were normal. No surgery was performed as a result of the accident. One of her neurological examinations showed no abnormalities. A second neurological examination was "completely normal" and "no motor weakness" was found.

Of critical importance in this case was the emphasis of respondents on the defense of malingering. The jury was free to accept or reject that defense. The record indicates that the defense was found credible. The trial court did not err in denying appellant's motion for new trial or conditional additur.

## IV.

Appellant next argues that the trial court erred in determining that there would be no offset against any reduction in the jury damage award for full automobile insurance premiums paid by her during the two-year period immediately preceding the accident. The court made no award; respondents concede, however, that appellant is entitled to an offset for amounts she paid for her Personal Injury Protection (PIP) coverage.

Statutory construction and the application of statutes to the undisputed facts of a case involve questions of law, which this court reviews de novo. *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 393 (Minn.1998); *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 892 (Minn. 1996). Minn.Stat. § 548.36 (2004) states, in pertinent part:

Subd. 1. Definition. For purposes of this section, "collateral sources" means payments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf up to the date of the verdict, by or pursuant to:

(1) a federal, state, or local income disability or Workers' Compensation Act; or other public program providing medical expenses, disability payments, or similar benefits;

(2) ... automobile accident insurance or liability insurance that provides health benefits or income disability coverage; ...

(3) a contract or agreement ... to provide, pay for, or reimburse the costs of hospital, medical, dental or other health care services; or

(4) a contractual or voluntary wage continuation plan ... intended to provide wages during a period of disability....

Subd. 2. ... [W]hen damages include an award to compensate the plaintiff for losses .... [t]he court shall determine:

(1) amounts of collateral sources that have been paid for the benefit of the plaintiff or are otherwise available to the plaintiff as a result of losses ...; and

(2) amounts that have been paid ... by ... plaintiff or members of the plaintiff's immediate family for the two-year period immediately before the accrual of the action to secure the right to a collateral source benefit that the plaintiff is receiving as a result of losses.

Subd. 3. ... (a) The court shall reduce the award by the amounts determined under subdivision 2, clause (1), and offset any reduction in the award by the amounts determined under subdivision 2, clause (2).

Interpretation of the interplay between subdivision 1(2) and subdivision 2(2) of the statute is critical to the narrow issue we must decide here. Is the amount subject to setoff under subdivision 2(2) the full automobile insurance premiums paid for

the two years preceding the accident, or are only the PIP premiums entitled to be set off? This is an issue of first impression in Minnesota.

## A. History

Prior to the enactment of Minn.Stat. § 548.36, the common-law collateral-source rule directed courts on how to reduce a plaintiff's damage award when personal-injury costs were paid by a third party other than a defendant. *Imlay v. City of Lake Crystal,* 453 N.W.2d 326, 331 (Minn. 1990). Minn.Stat. § 548.36 was adopted in 1986, in an effort to "abrogate a plaintiff's common law right to be over-compensated and ... prevent double recoveries in many circumstances by requiring the deduction from the verdict of certain benefits received by a plaintiff.... [T]he primary goal of section 548.36 is to prevent double recoveries by plaintiffs...." *Id.*

## B. Legislative Intent

"When interpreting a statute, we first look to see whether the statute's language, on its face, is clear or ambiguous. A statute is only ambiguous when the language therein is subject to more than one reasonable interpretation." *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000) (citation omitted). "A statute should be interpreted, whenever possible, to give effect to all of its provisions; 'no word, phrase, or sentence should be deemed superfluous, void, or insignificant.'" *Id.* (quoting *Amaral v. St. Cloud Hosp.,* 598 N.W.2d 379, 384 (Minn.1999)). This court is to "read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations." *Id.*

Turning initially, and briefly, to Minn. Stat. § 548.36, subd. 1(2), the Minnesota Supreme Court has found that section to be "poorly written" and "ambiguous," not-ing that the language could be construed as "providing for one, two, three or four different types of collateral source benefits." *Imlay,* 453 N.W.2d at 334. The court, however, did not further interpret the statute, but instead stated that the legislature "may wish to reexamine [the subsection] to clarify its intentions." *Id.* To date that reexamination has not occurred.

The parties here do not dispute, however, the propriety of including sums received from "automobile accident insurance or liability insurance that provides health benefits or income disability coverage" as a collateral source benefit to be deducted from a damage award. And this court agrees with that inclusion. Our inquiry at this point must be how to give proper effect to the requirement of subdivision 3(a) that an offset be made to reduction of benefits received from that collateral source. That offset will either include all insurance premiums, whether they be for liability, collision, comprehensive, or other type of coverage, or it will be limited to only those premiums paid to provide health or income disability benefits.

When a court finds a statute ambiguous, it must "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2004). "The legislature's intent may be ascertained by considering, inter alia, the occasion and necessity of the law, the circumstances under which it was enacted, the mischief to be remedied, the object to be obtained and the consequences of a particular interpretation." *City of St. Paul v. Spencer,* 497 N.W.2d 305, 307 (Minn.App.1993), *review denied* (Minn. Apr. 20, 1993). Our review of the legislative history of Minn.Stat. § 548.36 did not aid us in discerning the intent of the legislature.

## C. Caselaw

While we find no Minnesota caselaw to assist this court in resolving the narrow question before us, that of foreign jurisdictions informs our inquiry. *See In re Cooke's Estate*, 207 Minn. 437, 446, 292 N.W. 96, 101 (1940) (stating decisions in other states have persuasive authority only and are entitled to such consideration as their reasoning merits).

In *Jones v. Riley*, 263 Conn. 93, 818 A.2d 749, 752–53 (2003), the parties stipulated that the plaintiff could not purchase certain medical pay coverage without purchasing an entire automobile liability policy. Thus, the plaintiff argued that she was entitled to a collateral offset for the total of premiums she paid to secure the entire policy. *Jones*, 818 A.2d at 753. The defendant argued that the offset should be limited to the premium amount attributable to medical coverage. *Id.* The trial court agreed with plaintiff. The Supreme Court of Connecticut disagreed, and interpreted statutory language strikingly similar to that in Minnesota as providing an offset only for the amount paid to secure a collateral source benefit received *as a result of* personal injuries. *Id.* at 754. The *Jones* court reasoned that if it was to award the entire amount paid to secure the automobile insurance coverage, plaintiff would be reimbursed for amounts paid to purchase liability, collision, and comprehensive coverage, resulting in a windfall recovery. *Id.* at 755. The court concluded that "[i]t cannot reasonably be contended that benefits paid out under the liability, collision or comprehensive coverage provisions of an automobile insurance policy are 'health ... or other similar insurance benefits,' or that they serve as payment or reimbursement" for health care services under the statute. *Id.* at 755 n. 5. The court reasoned that the statute allows for reimbursement for the premiums paid for

collateral source benefits *received;* plaintiff received medical benefits and was only entitled to offset medical payment premiums. *Id.* The court recognized that the purpose of the collateral source statute was to prevent plaintiffs from recovering a windfall and double recovery, and that by limiting a plaintiff's offset to only amounts paid for medical benefits coverage, the court ensured that the plaintiff was not overly compensated for her injuries. *Id.* at 755–56. Finally, the court reasoned that if plaintiff were allowed to recover entire automobile insurance premiums, a wide disparity in the size of offsets would result due to variation in the value of vehicles and in the amount of liability, collision, and/or comprehensive coverage a policyholder chooses to purchase. *Id.* at 757–58.

In *McKenna v. Carlson*, the District Court of Appeals of Florida was also faced with the issue of whether a claimant was entitled to an offset for the entire amount of automobile insurance premiums or only the amount attributable to PIP coverage. 771 So.2d 555, 556 (Fla.Dist.Ct.App. 5th Dist.2000). The trial court found that the claimant was entitled to offset the amount attributable to his PIP *and* collision premiums. *Id.* at 557. The district court of appeals agreed as to the PIP premium, but disagreed as to that for collision coverage. *Id.* at 558. The court reasoned that the plaintiff's cost to secure collision or liability coverage was not directly related to benefits received as a result of injury. *Id.*

Similar to the statute in *Jones*, Minn. Stat. § 548.36, subd. 1, defines a collateral source as a payment "related to the injury or disability in question." We conclude that any offset applied to the reduction of damages in this case must be related to the injury. Here, only appellant's PIP premiums are related to her injuries. Liability, collision, and comprehensive premi-

ums are not. Also similar to the statute in *Jones*, Minn.Stat. § 548.36, subd. 1(2), further defines a collateral source as "payments related to the injury or disability in question ... pursuant to: ... health, accident and sickness, or automobile accident insurance or liability insurance that provides *health benefits or income disability coverage.*" (Emphasis added.) There is nothing in this language to indicate that insurance premiums paid for property damage, such as collision, comprehensive, and certain liability insurance, are to be offset against reduction of an award. Furthermore, Minn.Stat. § 548.36, subd. 1(1), (3), (4), as set forth above, all emphasize health and disability benefits as collateral sources.

We find the analysis of the *Jones* and *McKenna* courts persuasive, and their interpretation of statutory language similar to that in Minnesota sound. We interpret Minn.Stat. § 548.36, subd. 3(a), to exclude an offset for premiums paid to secure liability, collision, and/or comprehensive coverage. Allowing appellant to offset her reduction in damages by the premiums she paid for these coverages would thwart the purpose of the statute and provide a windfall to her. The offset must be limited to premiums attributable to appellant's PIP coverage, and we remand to enable the trial court to award that offset.

## V.

■ Lastly, appellant argues that the trial court erred when it concluded that because the net damages award of $13,404.97 was less than respondents' offer under Minn. R. Civ. P. 68 of $35,000, appellant was not entitled to her costs and disbursements and respondents were entitled to theirs. Appellant also argues that she was the prevailing party. The district court found otherwise. This court reviews a district court's legal determinations re-

garding rule 68 offers of judgment de novo. *Vandenheuvel v. Wagner*, 690 N.W.2d 753, 754 (Minn.2005).

Under rule 68, "any party may serve upon an adverse party an offer to allow judgment to be entered to the effect specified in the offer or to pay or accept a specified sum of money, with costs and disbursements then accrued." Minn. R. Civ. P. 68. Respondents did just that; they offered appellant $35,000, including costs and disbursements, but did not specify the amount of those costs and disbursements.

■ Appellant argues first that respondents' offer of judgment did not meet the requirements of rule 68; that the offer must be for a specific amount of money in addition to costs and disbursements then accrued. Appellant argues that respondents' offer was for a lump sum which included costs and disbursements, and the lack of specificity makes it impossible to compare the offer with the final judgment.

Appellant's argument is not persuasive. We note initially that there is support in both federal and Minnesota caselaw for the proposition that a lump sum offer stating that costs and disbursements are included in the specified sum, is valid. *Marek v. Chesny*, 473 U.S. 1, 6, 105 S.Ct. 3012, 3015, 87 L.Ed.2d 1 (1985); *Hallow v. Filiyaro*, 526 N.W.2d 631, 633 (Minn.App.1995). In its findings in this case, the trial court explained that the net award was composed of $6,877.82 for medical expenses, $1,527.15 for wage loss expenses, and $5,000 for future medical expenses. It was possible for both the trial court and the parties themselves to compare the offer and final judgment. Appellant could have easily calculated how much of the $35,000 would have covered her costs and disbursements; she had a record of what those costs and disbursements totaled.

Award of costs and disbursements to respondents was proper.

■ Appellant's reliance on *Borchert v. Maloney*, 581 N.W.2d 838 (Minn.1998), to support her argument that respondents did not comply with rule 68 requirements is misplaced, although *Borchert* does lend persuasive support for appellant's argument that she was the prevailing party in this case and is, therefore, entitled to recover her costs and disbursements. In *Borchert*, the defendant's rule 68 offer was rejected and the case was tried to a jury. 581 N.W.2d at 839. The net award to plaintiff was lower than defendant's offer and plaintiff was ordered to pay defendant's costs and disbursements. Plaintiff was allowed, however, to recover her own costs and disbursements also. *Id.* On appeal, this court ruled that "[w]here a plaintiff rejects a Rule 68 offer of settlement by a defendant and [ultimately] receives a judgment less favorable than the [Rule 68] offer, the plaintiff is denied costs and disbursements." *Id.* at 839 (alteration in original) (quotation omitted). On review, the Minnesota Supreme Court disagreed, holding that plaintiff is entitled to her costs and disbursements. *Id.* at 841. In rendering its decision, the conflict between Minnesota Statutes chapter 549 and Minn. R. Civ. P. 68 was addressed as follows:

> The conflict arises because, under the statute, the prevailing party in a lawsuit is entitled to recover his or her costs and disbursements while, under the rule, when a party makes a Rule 68 offer which is rejected and the judgment finally entered is less favorable to the offeree than the Rule 68 offer, the offeree must pay the offeror's costs and disbursements.

*Id.* at 839.

The court recognized that it must first identify the prevailing party, concluding that a plaintiff who did not prevail was not entitled to any costs and disbursements. *Id.* The court stated that in identifying the prevailing party, "the general result should be considered, and inquiry made as to who has, in the view of the law, succeeded in the action." *Id.* at 840 (quoting *Haugland v. Canton*, 250 Minn. 245, 254, 84 N.W.2d 274, 280 (1957)). In concluding that the plaintiff was the prevailing party, the *Borchert* court reasoned that although the defendant was successful to some degree, in that the judgment against him was more favorable than the rule 68 settlement offer he made, the plaintiff had prevailed on the merits in the underlying action. *Id.*

The *Borchert* court next addressed whether rule 68 precluded plaintiff from recovering her costs and disbursements. *Id.* The court concluded that it did not, because "Rule 68 does not specifically state that the offeree is ... responsible for her own costs and disbursements." *Id.* The court further explained, "[i]f the rule was intended to prevent an offeree who prevails on the lawsuit's merits from recovering her costs and disbursements even though the judgment entered was less than the Rule 68 offer, it would specifically say so, as does Fed.R.Civ.P. 68." *Id.*

In applying the rationale of *Borchert* to the facts of this case, we reach the same conclusion as reached by that court. Appellant was awarded $13,404.97. She was the prevailing party in the underlying action. Her receipt of an award less than respondents' rule 68 offer should not prevent her, as the prevailing party, from recovering her own costs and disbursements. As noted by the *Borchert* court, permitting a plaintiff to recover her own costs and disbursements, while also being required to pay those of defendant, gives effect to both the statute and the rule, the effect of the latter payment pursuant to rule 68 serves as a powerful incentive for a plaintiff to reach settlement, even though

she may ultimately recover her own costs and disbursements under the statute if she prevails on the merits of the action. *Id.* at 841. We reverse the decision of the trial court that appellant was not entitled to recover costs and disbursements and remand to enable the court to assure that recovery.

## DECISION

The trial court did not abuse its discretion by allowing the testimony of respondents' expert, and properly instructed the jury on damages. The evidence supports the jury verdict, and the trial court did not err in denying appellant's new trial or conditional additur motion. The trial court failed to award appropriate offsets to collateral source reductions of the jury award to appellant and also erred in determining that appellant was not the prevailing party in this action and was not entitled to her costs and disbursements.

**Affirmed in part, reversed in part, and remanded.**